**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

C.T., and G.T.,

                    Plaintiffs,

v.

Blue Cross and Blue Shield of Illinois,

                    Defendant.

Case No.: 1:23-cv-06112

Judge Jeremy C. Daniel

Magistrate Judge Appenteng

## RULE 56.1 STATEMENT OF FACTS

Plaintiffs C.T. and G.T., through their undersigned counsel, hereby indicate that the following facts are material and undisputed for purposes of this motion.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

*G.T.'s Childhood and Early Medical History*

1. G.T. was born in the Summer of 2004.[1]

2. When G.T. was seven years old, he was removed from his parents' custody due to their "substance abuse and neglect (e.g., lack of running water, food, and hygiene practice)."[2]

3. Authorities were also concerned that domestic violence and sexual abuse may have been present in G.T.'s biological home.[3]

4. Following G.T.'s removal from his parents' care, "he lived in 12 separate places before he was adopted" by C.T. and his wife.[4]

---

[1] *See* Rec. 660.
[2] Rec. 660.
[3] *See* Rec. 660.
[4] Rec. 660; *see also* Rec. 2356 (establishing that C.T. is now G.T.'s father).

5.  During G.T.'s foster placements he would become "incredibly distressed when placed separate from his siblings, prompting an in-patient hospitalization due to self-harm threats."[5]

6.  There were also allegations that G.T. was physically abused in one of his foster placements.[6]

7.  In addition to his hospitalization for threatened self-harm, later medical records also indicate that G.T. received one residential treatment center placement "prior to adoption" but notes that no further information was "provided" on that point.[7]

8.  Notes from a psychological assessment taken May 31, 2020 indicated:

    It is important to note that [G.T.] becomes emotionally
    dysregulated when others attempt to discuss his past with him, and
    he even becomes upset with his siblings if they attempt to talk
    about their childhood.[8]

9.  C.T. and his wife adopted G.T. and his two biological siblings in 2015, when he would have been ten-to-eleven years old.[9]

10. Since adopting G.T., his parents observed that schools would frequently complain ghat he displayed "disruptive and defiant behavior" including "violent outbursts" that led to the creation of a behavioral contract for G.T. during elementary school.[10]

11. G.T.'s parents attempted to wean G.T. off the medication he had been prescribed in foster care in order to "observe his behaviors and determine" whether further

---

[5] Rec. 660.
[6] *See* Rec. 660.
[7] Rec. 661.
[8] Rec. 660.
[9] *See* Rec. 660.
[10] Rec. 2308.

medication was necessary – this caused G.T. to display "more occurrences" of his mental health problems.[11]

12. G.T. received "ADHD medication, IEP accomodations, and social skills counseling" but his family still continued to receive notices that G.T. was being disruptive, including hitting one of his friends with a hockey stick, shoving classmates, throwing things, holding a door closed so that teachers could not enter, and destroying or damaging property.[12]

13. G.T.'s family soon became unable to travel or take vacations "due to his violent behavior," and on weekends G.T.'s parents would not take time to themselves because they could not leave him with others "out of fear for their safety."[13]

14. G.T. would often "pace around the house," "open bedroom doors without knocking[,]" and take things from people's bedrooms – particularly his little sister "A." – without permission.[14] This resulted in A. locking her bedroom door and carrying the key with her.[15]

15. G.T. frequently broke household rules and "actively seek arguments" which he would then escalate into violence that would include "punching, biting, spitting, threatening, cursing, etc."[16]

16. G.T. also engaged in headbanging, wallpunching, destruction of family members' property, and physical threats to punch, stab, or kill members of his family.[17]

---

[11] Rec. 2309.
[12] Rec. 2309.
[13] Rec. 2309-10.
[14] Rec. 2310.
[15] *Id*.
[16] Rec. 2310.
[17] *See* Rec. 2310.

17. As a result, G.T.'s little sister A. and older brother T. began attempting to avoid G.T. when he was home.[18]

*G.T.'s Adolescence and Medical History Prior to CALO*

18. A few days before New Year's Eve, 2018, G.T. pulled "one of the kitchen knives out" and threatened his little sister A. with it.[19]

19. On December 28, 2018 G.T. also told A. to "kill herself" because he was upset she had not voted to watch a movie he wanted to see during a group activity.[20]

20. On New Year's Eve, 2018, G.T. became impatient with A. not waking up when he wanted her to and "shook her bed until she was awake."[21]

21. After returning home on January 1, 2019, G.T. "lunged across the dining room table" and hit his mother by unexpectedly punching her in the mouth after his father had restrained him and he had seemingly calmed down.[22]

22. On January 1, 2019, a hospital admission note separately observed that G.T. had "threatened to kill himself and to kill his parents" and hit his mother, reporting that his trigger was "arguing with [his] parents."[23]

23. Following this incident, G.T. was hospitalized in an inpatient psychiatric hospital setting for eight days.[24]

---

[18] *See* Rec. 2310.
[19] Rec. 2311.
[20] Rec. 2311.
[21] Rec. 2311.
[22] Rec. 2312.
[23] Rec. 4944.
[24] *See* Rec. 2312.

24. At the urging of G.T.'s psychiatrists, the family implemented a "safety plan" that involved A. keeping a "packed bag in her room so she could flee to the safety of a neighbor's house" when G.T. had a violent outburst.[25]

25. G.T.'s parents reported that A. had to utilize this safety plan "often" and that G.T. sometimes responded by coming "to the neighbor's house in attempts to make her feel unsettled[,]" causing G.T.'s parents to make a deal with the neighbors "not to allow [G.T.] to visit when [A.] felt unsafe."[26]

26. On April 19, 2019, G.T. attempted to hit his father with a "full size wooden baseball bat" that his father managed to wrestle away from him.[27] The baseball bat was subsequently taken away from G.T.'s room.[28]

27. During the summer of 2019, A. again informed her parents that G.T. had threatened her with a kitchen knife and called her "whore" and "bitch" and similar "inappropriate, derogatory terms[.]"[29] G.T.'s psychiatrist was informed of this.

28. In the fall of 2019, G.T.'s parents also learned he had threatened A. with "gestures of taking a knife to her stuffed animal's throat."[30]

29. As G.T.'s parents explained next, that same fall A. began middle school and G.T. started high school – causing A. to be home alone with G.T. "for an hour or so" each day until their parents returned home from work.[31]

---

[25] Rec. 2312.
[26] Rec. 2312.
[27] Rec. 2313.
[28] *See id.*
[29] Rec. 2313.
[30] Rec. 2313.
[31] Rec. 2313.

30. Following this, A. began consistently presenting with "mysterious bruises on her legs" that did not go away until G.T. was sent to Trails and then went away abruptly thereafter.[32]

31. While they would not learn it until later, T. began altering his work schedule to ensure he was home in order to "protect" A. and his mother form G.T. "because he feared [G.T.] would become violent."[33]

32. The family pets began to be afraid of G.T., refusing to "look at [G.T.] or go near him" and to avoid him consistently.[34]

33. On September 25, 2019, a hospital admission note recorded the following "Admission Note" concerning G.T.:

Pt came in through the emergency department via ambulance after a physical altercation with father. Pt reports that this all started on Sunday when he wanted to go over to a friend (boy) house, Pt reports that mother became upset after finding out he was at the friends house and called father and scolded him. Come Monday father and pt were arguing in the car and father hit patient with the back of his hand on pt chest. Pt then report he punched father in the face twice. Pt reports on Tuesday father became- angry with him and told him to do his homework on the computer. The patient decided to play games again, and father called him out on this and pt became angry. Father and son then got in a[ ] physical altercation with pt hitting his father and father trying to stop him by holding him. …[35]

34. On March 23, 2020 G.T. became angry, prompting A. to grab her prepacked bag and run.[36]

---

[32] *See* Rec. 2318. Notably, once the bruises went away, A. admitted she felt safer when A. was not home.
[33] Rec. 2317.
[34] Rec. 2316.
[35] Rec. 4853.
[36] *See* Rec. 2317.

35. While A. was running, G.T. threatened to stab his father and attempted to grab a pair of scissors.[37]

36. G.T.'s father managed to put G.T. in a medical hold.[38]

37. As a result, G.T. punched his father three times in the face and threatened to bite his father's neck so that his father would bleed to death.[39]

38. G.T. was psychiatrically hospitalized "for 4 days in March 2020 due to [his] aggression towards adoptive parents."[40]

39. In interviews following this incident, A. admitted that she did not feel safe "when [G.T.] was at home."[41]

40. On May 8, 2020 Trails informed G.T.'s parents that it recommended G.T. go to residential mental health treatment following his time at Trails.[42]

41. A psychological assessment conducted May 31, 2020 also indicated:

> Since [G.T.'s] been at Trails, it has come to light that there is [sic] most likely some neurodevelopment differences, not ADHD. This looks like perseverative behavior, rigidity, difficulty transitioning, as well as an inability to take perspective, understand tone of voice, inflection, sarcasm. He struggles to understand and interpret meaning, build peer relationships as there is no reciprocity, and he talks "at" people as opposed to "with" people. He displays an awkward aloofness with his group, not knowing when to jump in and participate, He is using his skills at Trails and will continue to need support with frustration tolerance, relationship building and emotional regulation.[43]

42. G.T. graduated from Trails on June 24, 2020.[44]

---

[37] *See* Rec. 2317.
[38] *See* Rec. 2317.
[39] *See* Rec. 2317.
[40] Rec. 5774.
[41] Rec. 2317-18.
[42] *See* Rec. 2318.
[43] Rec. 661.
[44] *See* Rec. 2318.

43. As of May 31, 2020, G.T.'s DSM-V Diagnoses included:

    309.81 Posstraumatic Stress Disorder

    314.01 Attention Deficity/Hyperactivity Disorder, Combined presentation

    995.52 Child Neglect

    995.54 Child Physical Abuse

    995.53 Child Sexual Abuse (suspected)[45]

44. G.T. was admitted into CALO on June 25, 2020.[46]

45. While at CALO, G.T.'s medical records reflect at least the following events:

    a. June 26, 2020 – following individual therapy, G.T.'s therapist memorialized that while G.T. "denied any current suicidal/homicidal ideation or intent[,]" G.T. also vocalized "the following symptoms and behaviors demonstrating the continued need for RTC level of care[:] **Functional Impairments:** Unable to manage interpersonal conflict, Poor judgment or decision making skills and Poor/intrusive boundaries."[47]

    b. June 29, 2020 – following individual therapy, G.T.'s therapist memorialized that G.T. vocalized "the following symptoms and behaviors demonstrating the continued need for RTC level of care[:] **Functional Impairments:** Unable to manage interpersonal conflict, Poor judgment or decision making skills and Poor/intrusive boundaries."[48]

---

[45] Rec. 661.
[46] *See* Rec. 2292 (identifying the date of admission).
[47] Rec. 7092 (emphasis in original).
[48] Rec. 7091 (emphasis in original).

c. Later on June 29, 2020 – G.T. became angry "thinking that some peers were teasing him" and so "went to the side of the team home and punched his wooden bed frame with his left hand."[49] A separate report records that G.T. also showed "physical aggression" through "[h]itting" and verbal aggression through using "[p]rofanity."[50]

d. July 10, 2020 – following individual therapy, G.T.'s therapist memorialized that G.T. vocalized "the following symptoms and behaviors demonstrating the continued need for RTC level of care[:] **Functional Impairments:** Unable to manage interpersonal conflict, Poor judgment or decision making skills and Poor/intrusive boundaries."[51] G.T.'s therapist also indicated that G.T. "expressed frustration over being part of a team[,]" said "being around the other boys is stressful and that he is still upset about what happened last week" and "processed anxiety and frustration over being at [CALO]."[52]

e. July 14, 2020 – following individual therapy, G.T.'s therapist memorialized that G.T. vocalized "the following symptoms and behaviors demonstrating the continued need for RTC level of care[:] **Functional Impairments:** Unable to manage interpersonal conflict, Poor judgment or decision making skills and Poor/intrusive boundaries."[53]

f. July 23, 2020 – following individual therapy, G.T.'s therapist memorialized that G.T. vocalized "the following symptoms and behaviors demonstrating the

---

[49] Rec. 675.
[50] Rec. 7061; *see also* Rec. 1466 (same).
[51] Rec. 7090 (emphasis in original).
[52] Rec. 7090.
[53] Rec. 7089 (emphasis in original).

continued need for RTC level of care[:] **Functional Impairments:** Unable to manage interpersonal conflict, Poor judgment or decision making skills and Poor/intrusive boundaries."[54] G.T.'s therapist also noted G.T. was "distressed and crying" at the beginning of the session and had feelings of "hurt and anxiety" to process.[55]

g.  July 28, 2020 – following individual therapy, G.T.'s therapist memorialized that G.T. "was feeling very overwhelmed by anger" towards two of his peers at CALO and showed "**Functional Impairments**" that demonstrated "the continued need for RTC level of care[,]" including "[a]nimosity toward another person or group, [a]ttempts to damage relationships with others[,] and [i]mpaired social relationships."[56]

h.  July 30, 2020 – CALO staff observed that G.T. exhibited "relational issues while interacting with peers and staff[,]" including by isolating "away from peers and staff[,]" becoming "[n]on-responsive when spoken to[,]" and something CALO staff characterized as "Hypervigilance **Student Aggression**."[57]

i.  August 3, 2020 – CALO staff observed that G.T. refused "to follow verbal cues/redirection" and refused "to follow basic instructions" throughout the day.[58]

j.  August 6, 2020 – following individual therapy, G.T.'s therapist memorialized:

Writer observes\[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for

---

[54] Rec. 7088 (emphasis in original).
[55] Rec. 7088.
[56] Rec. 7087 (emphasis in original).
[57] Rec. 7036 (emphasis in original). Plaintiffs could not find any notes in the record explaining what "Hypervigilance **Student Aggression**" means or shedding more light on G.T.'s behavior on July 30, 2020.
[58] Rec. 7033.

RTC level of care; **Functional Impairments:** Unable to manage interpersonal conflict, Poor/intrusive boundaries, Poor judgment or decision making skills, Impaired social relationships and Inability to maintain healthy relationships with peers or adults.[59]

k. August 11, 2020 – following individual therapy, G.T.'s therapist memorialized:

The vehicle used during session was [G.T.'s] experience in foster care. [G.T.] stated that he was having "PTSD flashbacks" and described an incident wherein he watched his father stab a sword at his mother's head during [an] argument (it did not hit her). He also talked about an incident wherein he shouted at a couple of kids to be quiet while in foster care because he had a headache. They refused to do so, so his brother pushed one of them down. That child accused him of hitting him and his brother was separated from him and his sister for a few years. Processed feelings of anger and guilt over how this impact their relationship.

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Unable to manage interpersonal conflict, Poor/intrusive boundaries, Lacks independent living skills, Poor judgment or decision making skills and Impaired social relationships.[60]

l. August 13, 2020 – CALO staff reported that G.T. had exhibited "relational issues" by isolating "away from peers and staff" and also displayed "physical aggression" through "[p]osturing."[61] CALO staff further memorialized that G.T. was having conflicts with two of his peers and "mentioned twice he was upset and about to blow up about his feelings."[62]

m. August 18, 2020 – an individual therapy note recorded:

Description of Session: The vehicle used during session was [G.T.'s] transition to Calo. [G.T.] expressed hurt that he did not see his family when he moved from wilderness to Calo. He said he understood why he could not go home first (the pandemic), but felt

---

[59] Rec. 7086 (emphasis in original).
[60] Rec. 7085 (emphasis in original).
[61] Rec. 7027.
[62] Rec. 7027 (emphasis omitted).

left out of what is happening at home. He said he feels things are too stressful at home and that he could be helping there.

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor judgment or decision making skills, Poor/intrusive boundaries and Inability to maintain healthy relationships with peers or adults.[63]

n. August 24, 2020 – following an individual therapy session that G.T. requested be held early, G.T.'s therapist memorialized that: "Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Unable or unwilling to follow instructions and *requires constant redirection or intervention*, Inability to maintain healthy relationships with peers or adults, Inappropriate behaviors for the situation and Impaired social relationships."[64]

CALO staff also noted on that day that G.T. had "[r]efused to follow verbal cues/redirection[,]" refused "to follow basic instructions[,]" horseplayed, bullied others, shown verbal aggression through "bullying" and showed physical aggression through "[h]itting[,]" "[p]unching walls/objects[,]" and "[p]roperty destruction[.]"[65]

o. August 26, 2020 – CALO staff recorded that G.T. "[r]efused to follow verbal cues/redirection[,]" refused "to follow basic instructions[,]" horseplayed, and showed physical aggression through "[h]itting[,]" "[p]ushing/shoving[,]" and "[p]unching walls/objects[.]"[66]

---

[63] Rec. 7084 (emphasis in original).
[64] Rec. 7083 (first emphasis in original).
[65] Rec. 7017; *see also* Rec. 4248 (same).
[66] Rec. 7016.

p.  August 31, 2020 – an individual therapy note observed that G.T. was "resistant to discussing his past, but puts down boundaries around this appropriately."[67] That same day, CALO staff recorded that G.T. "[r]efused to follow verbal cues/redirection[,]" refused "to follow basic instructions[,]" horseplayed, and showed physical aggression through "[h]itting[.]"[68]

q.  September 1, 2020 – an individual therapy note indicated that G.T. stated he suffered "abuse" while in foster care "but did not want to discuss it further."[69] He was also hesitant to communicate about his biological parents.[70] Following the session, G.T.'s therapist memorialized:

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor judgment or decision making skills, Poor/intrusive boundaries, Inability to maintain healthy relationships with peers or adults and Impaired social relationships.[71]

r.  September 2, 2020 – CALO staff recorded that G.T. "[r]efused to follow verbal cues/redirection[,]" refused "to follow basic instructions[,]"and showed physical aggression through "[h]itting"and "[p]unching walls/objects[.]"[72]

s.  September 8, 2020 – an individual therapy note indicated:

Description of Session:

The vehicle used during session was [G.T.'s] upcoming off campus visit. [G.T.] processed anxiety over the visit. He said he was very excited to see everyone, but was afraid he might "lose it" if he becomes angry or upset. He said he did not want to hurt anyone and really wanted to show he is making progress. Therapist

---

[67] Rec. 1306.
[68] Rec. 7011.
[69] Rec. 7082.
[70] *See* Rec. 7082.
[71] Rec. 7082 (emphasis in original).
[72] Rec. 7010; *see also* Rec. 1415 (confirming this).

encouraged him to stay in the moment and see it as an opportunity to practice.

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor judgment or decision making skills, Poor/intrusive boundaries, Inability to maintain healthy relationships with peers or adults and Impaired social relationships.[73]

t.   September 10, 2020 – G.T. got angry after being "antagonized" by a peer and kicked a hole in the ceiling above his bunk.[74] Unlike several of G.T.'s violent outbursts, this one did not result in "Safety Closeness" (a condition where staff remain within a certain distance to prevent them from causing further harm)[75] because G.T. "appeared genuine and sincere" when he indicated he had not meant to damage the ceiling.[76]

u.   September 14, 2020 – an individual therapy note indicated:

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor judgment or decision making skills, Poor/intrusive boundaries, Inability to maintain healthy relationships with peers or adults and Impaired social relationships.[77]

v.   September 22, 2020 – an individual therapy note indicated:

Description of Session:

The vehicle used during session was [G.T.'s] [home] visit. He said he was feeling very ashamed about how the acted during his visit. Therapist attempted to help him reframe the experience based on his level of awareness at the time. He said that he struggled to do

---

[73] Rec. 7081 (emphasis in original).
[74] *See* Rec. 673.
[75] *See, e.g.,* Rec. 668, 670 (reflecting incidents where G.T. was placed on "Safety Closeness" following a violent act).
[76] Rec. 673.
[77] Rec. 7080 (emphasis in original).

that because he felt too bad. Discussed shame and the way it impacts how we see our experiences.

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor judgment or decision making skills, Poor/intrusive boundaries, Inability to maintain healthy relationships with peers or adults and Impaired social relationships.[78]

w.  September 29, 2020 – an individual therapy note indicated:

Description of Session:

The vehicle used during session was [G.T.'s] past in foster care. He talked about being hit while staying with foster families, by both the adults and the other kids. He did not want to give many details. He was able to process feeling weak and helpless. He connected those feelings to some things he has felt lately.

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor judgment or decision making skills, Poor/intrusive boundaries, Inability to maintain healthy relationships with peers or adults and Impaired social relationships.[79]

x.  October 6, 2020 – per a contemporaneous "Safety Information Assessment":

[G.T.] got into a verbal disagreement which resulted in him throwing food at his peer ZF

…

[G.T.] was at breakfast across from peer ZF when they got into a verbal disagreement and a banana was thrown. GT then walked out of the kitchen. He gave minimal push back and was receptive to coaching and owning his safety closeness.

…

[G.T.] made vague remarks about wanting to kill himself but when staff spoke to him he said he did not mean it he was just angry.

---

[78] Rec. 7079 (emphasis in original).
[79] Rec. 7078 (emphasis in original).

Following individual therapy, G.T.'s therapist continued to opine that he showed

"symptoms and behaviors demonstrating the continued need for RTC level of care[,]"

including "[i]nability to maintain health relationships with peers or adults and

[i]mpaired social relationships[,]" "[p]oor judgment or decision making skills," and

"[p]oor/intrusive boundaries[.]"[80]

y.  October 8, 2020 – per a contemporaneous "Safety Information Assessment":

[G.T.] was having a secret conversation[ ] with [another student]
and [the other student] was being distracting to staff. [G.T.] walked
out of team home and ended up in the art loft and threw chairs off
almost hitting staff below. He was promptly taken to Chiefs
without a struggle. He said he couldn't take it any more.

…

[G.T.] did not seem overly angry or sad through the day this was
quite a surprise.

…

…there were no signs he was about to blow up in this way.

…unable to talk to student after incident[81]

z.  October 13, 2020 – in individual therapy, G.T. expressed remorse for "losing

control" and almost hitting a staff member with a chair thrown from the loft above

them, G.T.'s therapist continued to opine that he showed "symptoms and

behaviors demonstrating the continued need for RTC level of care[.]"[82]

aa. October 20, 2020 – an individual therapy note reported:

Description of Session:

The vehicle used during session was an incident from [G.T.'s]
past. [G.T.] participated in the gazespotting intervention. Initial

---

[80] Rec. 7077.
[81] Rec. 670.
[82] Rec. 7076.

activation at an 8 in the head and chest. He discussed the "hot, burning" anger he felt toward a former foster parent named "Darla". He talked about several incidents with her that made him feel anger. After further investigation [G.T.] said that underneath the anger was sadness and feelings of powerlessness. He said

that if he [sic] was not for "Darla" he would not need to be in treatment.

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor judgment or decision making skills, Impaired social relationships and Inability to maintain healthy relationships with peers or adults.[83]

bb. October 29, 2020 – CALO staff reported that G.T. displayed "physical

aggression" through hitting.[84]

cc. October 30, 2020 – an individual therapy note memorialized:

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor judgment or decision making skills, Poor/intrusive boundaries, Inability to maintain healthy relationships with peers or adults and Impaired social relationships.[85]

However, G.T.'s therapist did identify that G.T.'s therapy sessions switched from

focusing on "Trauma" as a "client problem area" to focusing on "Attachment/Healthy

Relationships.[86]

---

[83] Rec. 7075 (emphasis in original).
[84] Rec. 1372.
[85] Rec. 7074 (emphasis in original).
[86] Rec. 7074. To Plaintiffs' knowledge, this was the first time G.T.'s therapist at CALO was able to center an individual therapy session on G.T.'s attachment and relationship issues instead of solely focusing on his trauma. While the therapist did not keep contemporaneous notes about this change and neither Plaintiffs nor their counsel are qualified to offer medical opinion concerning it, this change plus notes generated October 31, 2020 (*see* Rec. 677-78, referenced in next bullet point) appear to reflect that G.T.'s was making incremental progress in therapy.

dd. Also October 30, 2020 – CALO staff reported that G.T. displayed "physical aggression" through hitting.[87]

ee. October 31, 2020 – an individual therapy note indicated: "[G.T.] participates well in individual sessions. He has been willing to participate in some conversations around his trauma, but appears hesitant to go too deep … He is able to explore a little more each time he meets with the therapist."[88]

ff. November 3, 2020 – following individual therapy, G.T.'s therapist indicated:

> Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor judgment or decision making skills, Poor/intrusive boundaries and Inability to maintain healthy relationships with peers or adults.[89]

gg. November 10, 2020 – an individual therapy note memorialized that G.T.'s therapist continued to believe he needed residential treatment for the reasons already identified on November 3, 2020, but had added her conclusion that G.T. also showed symptoms and behaviors demonstrating that as of that time he was *"[u]nable to manage interpersonal conflict."*[90]

hh. November 17, 2020 – following an individual therapy session where G.T. indicated that "in the past his experiences [with holidays] have not been positive" but "would not explore some of the more painful memories[,]" his therapist memorialized that:

> Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor judgment or

---

[87] Rec. 1371.
[88] Rec. 677-78.
[89] Rec. 7073 (emphasis in original).
[90] Rec. 7072 (emphasis added).

decision making skills, Poor/intrusive boundaries and Inability to maintain healthy relationships with peers or adults.[91]

ii. November 23, 2020 – following individual therapy in which G.T. and his therapist discussed an upcoming home visit, G.T.'s therapist continued to identify that he needed additional RTC care because he demonstrated functional impairments due to: "[p]oor judgment or decision making skills, [p]oor/intrusive boundaries and [i]nability to. maintain healthy relationships with peers or adults."[92]

jj. November 30, 2020 – CALO staff reported that G.T. displayed "physical aggression" through hitting.[93]

kk. December 9, 2020 – following individual therapy, G.T.'s therapist memorialized the following:

Description of Session:

The vehicle used during session was the upcoming Christmas visit. [G.T.] said that his off campus visit went really well. He said he should have spent more time with family members other than his brother. He said he wanted an overnight visit for Christmas. He said if his parents say "no", then he will know they are not really hearing him. Therapist encouraged him to re frame these assumptions to his parents not feeling he is ready, rather than not hearing him.

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care; **Functional Impairments:** Poor/intrusive boundaries, Trouble with keeping personal physical space, Impaired social relationships, Inappropriate behaviors for the situation and Inability to maintain healthy relationships with peers or adults.[94]

---

[91] Rec. 7071 (emphasis in original).
[92] Rec. 7070.
[93] Rec. 1349.
[94] Rec. 7068 (emphasis in original).

ll. December 10, 2020 – CALO staff reported that G.T. displayed "physical aggression" through "[p]osturing" and hitting, that he screamed/yelled and threatened staff, and that he also displayed hypervigilance, refused to follow basic instructions, and refused to "follow verbal cues/redirection[.]"[95] This led to him being "[s]eparated from therapeutic group" for an unspecified period of time.[96]

mm. December 16, 2020 – following individual therapy, G.T.'s therapist memorialized:

Writer observes/[G.T.] continues to report on the following symptoms and behaviors demonstrating the continued need for RTC level of care;

**Functional Impairments:** Poor/intrusive boundaries, Impaired social relationships, Inability to maintain healthy relationships with peers or adults and Poor judgment or decision making skills.[97]

nn. December 27, 2020 – CALO staff reported that G.T. displayed "physical aggression" through "[h]itting" and that he displayed hypervigilance.[98]

oo. December 30, 2020 – CALO staff reported that G.T. displayed "physical aggression" through "[p]osturing" and hitting, and also reported that he displayed hypervigilance, refused to follow basic instructions, and refused to "follow verbal cues/redirection[.]"[99]

pp. Following January 5, 2021 – a progress evaluation reported that:

[G.T.] is engaged in treatment and attends all sessions. We are seeing a major increase in his anger lately. He has been targeting weaker teammates and being physically aggressive. He was recently disrupted in the relationship with his canine after he

---

[95] Rec. 1338; *see also* Rec. 3225 (noting more hitting on the same day).
[96] Rec. 1339.
[97] Rec. 7067 (emphasis in original).
[98] Rec. 1327.
[99] Rec. 1325.

admitted to hitting her several times when he was frustrated or angry with her.

…

When [G.T.] is angry or upset, he struggles to listen to coaching staff. He punches walls, bed frames, and tables. He becomes verbally aggressive with other students, which can escalate into physical aggression.

…

[G.T.] has also verbalized that he is afraid he will hurt someone else.

…

On his home visit for Christmas, [G.T.] was aggressive at times. He escalated quickly when angry and was overheard threatening his canine. He became angry at his mother during a game and slammed his fist down on the table, which scared his little sister. She locked herself in a room because she was afraid. There were a few instances on the visit where he was angry and escalating verbally to the point where parents thought they may need to bring him back to campus.

…

[G.T.] has been attempting to work through his early trauma in individual therapy, but struggles to do so in the moment. He shuts down. He recognizes that his anger right now is due to events from his past and it's all sitting on the surface for him. The work with his canine has made him realize that the way he was treated as a child is impacting his ability to have relationships now. He cannot verbalize all of this, so it comes out as anger.

…

[G.T.] is not safe to go home. He is working through a great deal of anger. He was verbalized that he is afraid he will hurt someone else.[100]

qq. January 7, 2021 – CALO staff reported that G.T. displayed "physical aggression" through "[p]osturing" and hitting, and also reported that he displayed

---

[100] Rec. 2063-65.

hypervigilance, refused to follow basic instructions, and refused to "follow verbal cues/redirection[.]"[101]

rr. January 9, 2021 – CALO staff reported that G.T. displayed "physical aggression" through hitting and also displayed hypervigilance, refused to follow basic instructions, and refused to "follow verbal cues/redirection[.]"[102]

ss. January 12, 2021 – per a contemporaneous "Safety Information Assessment":

> While in class, [G.T.] began to argue with student HW about some issues he was having in the team home. [G.T.'s] temperament escalated from calm to angry in moments notice and he aggressively struck HW in the arm with a closed fist.
>
> …
>
> After [G.T.] struck HW in the arm, he slammed his desk on the floor and shouted, "l need to take five!". He left the room, slamming the door behind him. He quietly went to the school's front entryway to talk with staff. The escalation of the incident was very sudden. [G.T.] was able to leave class on his own accord and regulated in the front entryway of the school under staff's supervision.[103]

In his own description of this incident, G.T. observed "I blacked out and don't even remember hitting anyone."[104]

tt. January 19, 2021 – CALO staff reported that G.T. got physically violent by "[p]ushing/[s]hoving" and hitting.[105]

uu. Shortly after January 20, 2021 – an assessment by G.T.'s attending physician noted that during his last therapy sessions on "1/20/2021" G.T. "disclosed a past traumatic incident to his parents" and noted "[G.T.] is not safe to go home. He is

---

[101] Rec. 1322.
[102] Rec. 1320.
[103] Rec. 668.
[104] Rec. 668.
[105] Rec. 1314.

working through a great deal of anger. He has verbalized that he is afraid he will hurt someone else… [G.T.] disclosed that he is afraid he will hurt someone else out of anger… Verbal and physical aggression are getting worse at the moment since he started to engage more therapeutically."

vv. March 14, 2021 – CALO staff reported that G.T. threatened his peers, bullied his peers, refused to follow basic instructions, and showed physical aggression through "[h]itting" and throwing things.[106] A more detailed report indicated G.T. threw a "milk crate" full of video game controllers at another child in CALO and then punched the child.[107]

ww.     June 22, 2021 – CALO staff reported that G.T. threatened to kill a puppy if he was "forced to train" it during his canine therapy, leading them to warn him that further threats like that would result in him being placed on "No k9 Interactions provision[.]"[108]

That same day, a "Concurrent Review" conducted on G.T. observed:

[G.T.] is engaged in treatment and attends all sessions. We are seeing a major increase in his anger lately. He has been targeting weaker teammates and being physically aggressive. He was recently disrupted in the relationship with his canine after he admitted to hitting her several times when he was frustrated or angry with her.

…

When [G.T.] is angry or upset, he struggles to listen to coaching staff. He punches walls, bed frames, and tables. He becomes verbally aggressive with other students, which can escalate into physical aggression.

---

[106] Rec. 2775.
[107] *See* Rec. 2320.
[108] Rec. 1118.

…

[G.T.] has not made any statements that indicate suicidal ideation or intent; however, he has been expressing feelings of worthlessness. He often disassociates when his past is brought up in session. He shuts down in group when peers attempt to address issues in the team home with him. *[G.T.] has also verbalized that he is afraid he will hurt someone else*.

…

Since Christmas [G.T.] has needed staff to intervene in events three or four times. He has been in three or four physical altercations with other students wherein he hit someone. He was placed in the Cheifs team home for a day to regulate because he was so angry after one incident.

…

He is specifically targeting a student in the team home who is smaller than him to take [out] his anger.

…

On his home visit for Christmas, [G.T.] was aggressive at times. He escalated quickly when angry and was overheard threatening his canine. He became angry at his mother during a game and slammed his fist down on the table, which scared his little sister. She locked herself in a room because she was afraid. There were a few instances on the visit where he was angry and escalating verbally to the point where parents thought they may need to bring him back to campus.

…

[G.T.] is not safe to go home. He is working through a great deal of anger. He has verbalized that he is afraid he will hurt someone else.

…

Verbal and physical aggression are getting worse at the moment since he started to engage more therapeutically.[109]

---

[109] Rec. 1477-48 (emphasis added).

xx. June 23, 2021 – CALO staff reported that G.T. refused to follow basic instructions, destroyed property, showed verbal aggression through profanity, and engaged in unpermitted horseplay.[110]

yy. June 25, 2021 – CALO staff reported that G.T. "[i]solated away from peers and staff[,]" refused to follow verbal cues or redirect, refused to follow basic instructions, was non-responsive when spoken to, and refused to follow basic instructions.[111]

zz. July 15, 2021 – CALO staff reported that G.T. displayed "[h]ypervigilance" and displayed physical aggression through posturing and hitting.[112]

aaa. August 6, 2021 – CALO staff reported that G.T. "[r]efused to follow verbal cues/redirection" and displayed physical aggression through posturing, hitting, and throwing things.[113]

bbb. August 27, 2021 – CALO staff reported that G.T. threatened his peers and displayed physical aggression through: posturing, hitting, kicking, punching walls/objects, and pushing/shoving.[114]

ccc. October 22, 2021 – CALO staff reported that G.T. displayed physical aggression through "hitting" and verbal aggression through "screaming/yelling."[115]

---

[110] *See* Rec. 1115.
[111] Rec. 1112.
[112] Rec. 1067.
[113] Rec. 1028.
[114] *See* Rec. 989.
[115] Rec. 874.

ddd.        December 9, 2021 – CALO staff reported that, among other things, G.T.

threatened staff, screamed and yelled, intimidated others, displayed "physical

aggression" through "hitting[,]" refused to follow verbal cues and redirections,

refused to follow basic instructions, bullied, and was non-responsive when spoken

to.[116]

eee.        December 21, 2021 – CALO staff reported that G.T. "[r]efused to follow

verbal cues/redirection[,]" refused to "follow basic instructions[,]" and showed

verbal aggression through "[p]rofanity" on this date.[117]

fff.  December 22, 2021 – an "Interventions and Responses Report" compiled on this

date indicates: "Residential staff report seeing an increase in [G.T.'s] anger,

including punching the walls. Staff feel this is because he is anxious about going

home in January. He is afraid he will do something during his Christmas home

visit that will cause him to stay longer."[118]

ggg.        December 30, 2021 – CALO staff reported that G.T. "[r]effused to follow

verbal cues/redirection[,]" engaged in "[h]orseplay[,]" and displayed verbal

aggression through the use of profanity.[119]

hhh.        January 2, 2022 – CALO staff reported that G.T. "[r]efused to follow

verbal cues/redirection[,]" engaged in "[h]orseplay[,]" refused to "follow basic

instructions[,]" was "[n]on-responsive when spoken to[,]" and displayed verbal

aggression through using profanity and teasing/insulting others.[120] G.T. also

---

[116] Rec. 824.
[117] Rec. 767.
[118] Rec. 775.
[119] Rec. 765.
[120] Rec. 758.

displayed physical aggression by punching walls/objects and knocking over furniture.[121]

    iii.   January 3, 2022 – while G.T. was not aware of this yet, CALO staff began coordinating with his parents to release him from CALO beginning January 14, 2022.[122]

    jjj.  January 4, 2022 – CALO staff notes indicated G.T. threatened staff, punched walls or objects, refused to follow instructions or verbal cues, was non-responsive when spoken to, and displayed verbal aggression through "[p]rofanity" and teasing/insults.[123]

    kkk.      January 5, 2022 – CALO staff notes indicate G.T. bullied others, refused to follow instructions or verbal cues, was non-responsive when spoken to, used profanity, mocked others, and displayed further aggression through "[i]ntimidating others[.]"[124]

    lll.   January 6, 2022 – an Incident Report generated by CALO indicated:

> Students were sitting in team home, sitting around the table hanging put. The students were talking, when one of them said something jokingly. Student GT was not receptive and did not like what was said. Student GT then turned around and ran at the closed team home door, breaking the team home door open and slamming it against the outside wall. This damaged the door latch.[125]

Further descriptions of this incident indicated G.T. screamed, yelled, used profanity, and refused to follow instructions or redirect during this incident.[126]

---

[121] *See id.*
[122] *See* Rec. 756 (discussing this transition).
[123] Rec. 751.
[124] Rec. 750.
[125] Rec. 748.
[126] *See* Rec. 746.

mmm.        January 11, 2022 – CALO staff observed that G.T. refused to follow

instructions, displayed verbal aggression through "[p]rofanity[,]" and refused to

follow verbal cues or redirect.[127]

nnn.        January 12, 2022 – an "Individual Therapy Note" observed that G.T. was

still displaying impaired social relationships, poor/intrusive boundaries, and poor

judgment or decision making skills.[128]

ooo.        January 14, 2022 – G.T. was discharged from CALO.[129] In their discharge

recommendations, CALO recommended that G.T. "continue to engage in trauma-

focused individual and family therapy."[130]

*BCBSIL's Denials and Plaintiffs' Appeals*

46. BCBSIL sent a letter dated February 2, 2021 that denied coverage for all of G.T.'s

treatment at CALO, stating in pertinent part:

Per the medical necessity provision of your benefit plan, a medical
necessity review has been completed. Based on the information
provided, you do not meet MCG care guidelines Residential Acute
Behavioral Health Level of Care (Child/Adolescent) 24th Edition
for the following reasons: You came to this treatment on June 2020
to get help with your mood and aggression. The dates under review
now start from 1/27/21. Your doctor said that your mood is getting
better. You are more responsive to redirection. You are not
suicidal. You are not homicidal. You are not self-injuring. You are
taking your medications without issue. You do not have medical
issues that need this level of care. You are future focused. You are
attending and participating in groups. You are learning coping
skills. Your insight is better. You have been able to go on off
campus passes in the past. You are completing your daily living
needs. You have access to a safe step-down. You have supportive
family who are involved in your care. Based on the clinical at
hand, you do not need 24-hour nursing, medical, or psychiatric

---

[127] Rec. 742.
[128] *See* Rec. 736.
[129] *See* Rec. 731.
[130] Rec. 732.

care now. From the information provided, you can be safely treated in a different setting such as Mental Health Partial Hospital/Day Treatment. No medically necessary days were authorized.[131]

47. Plaintiffs appealed this denial, arguing that G.T.'s medical records prior to his admission into CALO demonstrated that he needed the treatment he received at CALO.[132]

48. BCBSIL denied again in letter dated March 16, 2021.[133]

49. This denial letter did not indicate it was limited to only some of G.T.'s treatment at CALO, but instead indicated it was denying his claims from June 25, 2020 – the date of his admission to CALO.[134]

50. This denial letter further indicated that G.T.'s claims were denied because:

Per the medical necessity provision of your benefit plan, a medical necessity review has been completed. Based on the information provided, you did not meet MCG care guidelines Residential Acute Behavioral Health Level of Care (Child/Adolescent) 23rd Edition for the following reasons: On the dates in question you did not want to harm yourself. You did not want to harm others. You were in a wilderness program for 3 months right before this admission. You were learning how to manage your mood and feelings. You could have safely and effectively continued to do that in a lower level of care. While in treatment you attended and participated in groups. You were taking and tolerating your medications. You did not have medical issues that needed 24-hour care. You were able to complete your daily living needs. You had supportive family involved in your care. You had access to safe treatment in a lower level of care where you could continue your medications, therapy, and family work. From the information provided, you could have been safely treated in a less intensive setting such as Mental Health Partial Hospital/Day Treatment. No medically necessary days were authorized.[135]

---

[131] Rec. 2347.
[132] *See* Rec. 2356.
[133] Rec. 2344.
[134] *See* Rec. 2344.
[135] Rec. 2344.

51. Plaintiffs sought an external review, and received a letter in which BCBSIL appeared to affirm its own denials.[136]

52. It is unclear from the record whether an external review organization ever reviewed G.T.'s request for benefits.[137]

---

[136] *See* Rec. 2292 (first page of external appeal letter dated June 29, 2021); Rec. 5637 and 5644 (the final denial letter, dated July 19, 2021 that apparently denied G.T.'s claims – originating from BCBSIL).
[137] *See generally* Rec. 1-7121.